UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| L. Willie Parks, | ) | C/A No. 5:13-868-MGL-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner of Social Security Administration, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). The issues before the court are whether the decision is supported by substantial evidence, and whether the Commissioner's decision contains an error of law. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I. Relevant Background

A. Procedural History

Plaintiff applied for DIB and SSI in September 2010, pursuant to Titles II and XVI of the Act, 42 U.S.C. §§ 401-403, and 380-83, *et seq.*, alleging a disability onset date of September 11, 2010. Tr. 108-14. His applications were denied in initial and reconsidered determinations. Tr. 79-93. On April 19, 2011, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ"), Tr. 94-95, which was held on November 18, 2011, Tr. 48-69. In a decision dated January 25, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Tr. 11-21. Plaintiff requested review of the decision, Tr. 7, which was denied by the Appeals Council, Tr. 1-5, making the ALJ's decision the final decision of Defendant (the Commissioner) for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on April 1, 2013. ECF No. 1.

### B. Plaintiff's Background and Relevant Medical History

#### 1. Background

Plaintiff was born on October 31, 1959. Tr. 51. He completed school through the tenth grade taking some "slow learner classes." Tr. 51-52. At the time of the hearing Plaintiff lived in a house with his fiancée and his nineteen-year-old daughter. Tr. 52. Plaintiff's past relevant work ("PRW"), from January 1995 to August 2008, was as a cement finisher. Tr. 137. Plaintiff stopped work because the company went out of business. Tr. 136.

#### 2. Relevant Medical History

##### a. Robin L. Moody, Ph.D.

On April 5, 2011, Social Security examiner, Robin L. Moody, Ph.D., conducted a Clinical Evaluation of Plaintiff. Tr. 557-61. With regard to Plaintiff's mental status, she noted that his attitude was "very cooperative" and he appeared to be of deficient intelligence. Tr. 559. Plaintiff was administered the Folstein Mini Mental Status exam[1] and scored 15/30.

---

[1] The Mini-Mental State Exam (MMSE) is a brief, structured test of mental status that takes about 10 minutes to complete. Introduced by Marshall Folstein and others in 1975, the MMSE tests global cognitive function, with items assessing orientation, word recall, attention and calculation, language abilities, and visuospatial ability. To assess orientation to time, for example, which accounts for 5 of the 30 points, the person is asked to state the year, season, date, day and month. Visuospatial ability accounts for one point and is assessed with

*Id.* Dr. Moody noted Plaintiff had most difficulty with identifying the date, year, month, and county; he could not complete serial 7's, 3's or 1's; he could not complete spelling backwards and stated he could not read at all; he missed all items for delayed recall; he could not repeat a phrase; he could not write a sentence; and he could not copy conjoined pentagons but instead drew two separated pentagons. *Id.* Dr. Moody provided the following clinical functional assessment:

> [Plaintiff] has moderate/severe restrictions of ADL's [Activities of Daily Living]. He does not prepare meals or complete chores. His Aid (sic) takes care of most of the housework and cooking. He does go shopping with his girlfriend. He reports that he does not have many friends. He is very close with his girlfriend and daughter, however. He reports that he leaves the house about once a week. His concentration and persistence were adequate. His pace was very slow. He appears to be able to carry out simple instructions but his Folstein performance suggested otherwise. He cannot manage his own funds. He is most likely embellishing his learning disabilities. His IQ is most likely in the Borderline range of intelligence.

Tr. 559. Plaintiff's scores on the Wechsler Adult Intelligence Scale ("WAIS-VI") were "very deficient" for verbal comprehension (61), processing speed (65), and full scale IQ (64), and "deficient" for perceptual reasoning (79) and working memory (71). Tr. 559-60. Plaintiff scored in the low range in all categories of verbal, performance, and supplemental subtests except he scored average in the performance subtests of block design and matrix reasoning. Tr. 560. Dr. Moody also administered to Plaintiff the Wide Range Achievement Test ("WRAT-4"). *Id.* Plaintiff's raw score, the standard score, and rank were as follows: word reading 20/55, K.9; sentence comprehension 24/67, 4.7; spelling 15/55, K.4; math

---

a single item, namely the copying of 2 intersecting pentagons. Scores on the MMSE range from 0 to 30, with scores of 25 or higher being traditionally considered normal. Scores less than 10 generally indicate severe impairment, while scores between 10 and 19 indicate moderate dementia . . . . However, scores may need to be adjusted or interpreted differently to account for a person's age, education, and race/ethnicity. *See* http://alzheimers.about.com/od/testsandprocedures/a/The-Mini-Mental-State-Exam-And-Its-Use-As-An-Alzheimers-Screening-Test.htm (last visited May 22, 2014).

computation 29/72, 4.0; and reading composite 122/60, very deficient. *Id.* Plaintiff's primary diagnoses included deficient intelligence, diabetes, hypertension, hyperlipidemia, vision problems, obesity, arthralgia, edema, economic problems, occupational problems, and a current GAF[2] of 68. Tr. 561.

### b. Don Salmon, Ph.D.

On November 7, 2011, Don Salmon, Ph.D. conducted a psychological evaluation of Plaintiff at the request of Plaintiff's counsel. Tr. 611-17. Dr. Salmon's report included "information obtained by review of records, interview and psychological testing." Tr. 611. Plaintiff's scores on the WAIS-VI administered by Dr. Salmon were as follows: verbal comprehension – 58, perceptual reasoning – 73, working memory – 63, processing speed – 59, and full scale IQ – 58. Tr. 615. Plaintiff's scaled scores for verbal comprehension, perceptual reasoning, working memory, and processing speed subtests ranged from two to six[3] (Plaintiff's scaled scores for block design and matrix reasoning were six). *Id.* Dr. Salmon also administered to Plaintiff the WRAT-IV and noted that Plaintiff "obtained a grade equivalent of Kindergarten in Reading." *Id.* Dr. Salmon opined that Plaintiff's WAIS-IV scores indicated Plaintiff was "functioning in the extremely low range of intellectual ability." *Id.* In comparing his scores to those obtained by Dr. Moody, Dr. Salmon noted "there is a significant decline in working memory and processing speed, which are credible

---

[2] The GAF is a 100-point tool rating overall psychological, social and occupational functioning of people over 18 years of age and older. It excludes physical and environmental impairment. A score of 70-61 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. *See* https://depts.washington.edu/washinst/Resources/CGAS/GAF%20Index.htm (last visited May 22, 2014).

[3] "If all subtest scaled scores are 7 or below, the individual is functioning below the average for his or her age peers in all the areas measured by the WAIS-IV." JEROME M. SATTLER & JOSEPH J. RYAN, ASSESSMENT WITH THE WAIS-IV 137-38 (2009).

4

as reactions to the recent motor vehicle accident and the resultant increase in physical pain and depression." Tr. 616.

Dr. Salmon's diagnostic impression included: adjustment disorder with depressed mood, mild mental retardation, diabetes, hypertension, insomnia, back and leg pain, blurred vision, dizziness, weakness, fatigue, social isolation, financial stressors and a SOFAS[4] score of 38-42 indicating a serious to major impairment in social and occupational functioning. Tr. 617. Dr. Salmon concluded that Plaintiff "has marked to extreme limitations in all spheres. Because of his limited cognitive functioning, he would need help managing funds if awarded benefits." *Id.*

In addition to his report, on the same day Dr. Salmon completed a Mental Impairment Questionnaire. Tr. 618-23. In the section of the report listing mental abilities and aptitudes needed to do unskilled work, Dr. Salmon opined that in 14-out-of-16 categories Plaintiff had "[n]o useful ability to function." Tr. 620. In the two categories of "[a]sk simple questions or request assistance" and "[b]e aware of normal hazards and take appropriate precautions" Dr. Salmon opined that Plaintiff was "[u]nable to meet competitive standards." *Id.* In the section of the report listing mental abilities and aptitudes needed to do semiskilled and skilled work, Dr. Salmon opined that in all four categories Plaintiff had "[n]o useful ability to function." Tr. 621. In the section of the report listing mental abilities and aptitudes needed to do particular types of jobs, Dr. Salmon opined that in three-out-of-five categories Plaintiff had "[n]o useful ability to function" and in the two remaining categories Plaintiff was "[u]nable to meet competitive standards." *Id.* Regarding Plaintiff's functional limitations, Dr. Salmon opined that Plaintiff had "marked to extreme" limitations in restriction of ADLs; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence

---

[4] Social and Occupational Functioning Assessment Scale.

or pace. Tr. 622. Dr. Salmon noted that Plaintiff had a medically documented history of a chronic organic mental, schizophrenic or affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do any basic work activity and a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." *Id.* Dr. Salmon also opined that Plaintiff's impairments or treatment would cause him to be absent from work more than four days per month. Tr. 623.

    C. The Administrative Hearing

        1. Plaintiff's Testimony

A hearing was held on November 18, 2011, at which Plaintiff and Vocational Expert ("VE") Patsy Bramlett testified. Tr. 48-69. Plaintiff testified that he was 53 years old, and "went to the 11th grade" but did not finish the 11th grade. Tr. 51. Plaintiff stated that he was in some "slow learner classes" for speech and reading. Tr. 52. At one point he obtained his driver's license by taking an oral test. *Id.* Plaintiff testified that he lived in a house with his fiancée and 19-year-old daughter. *Id.* His fiancée is disabled from a stroke. Tr. 59. Plaintiff testified that when he was "real little" he started working in his father's business as a cement finisher and continued doing that work as an adult. Tr. 53. In September 2010, Plaintiff was hospitalized for diabetes, which until that incident he did not know he had. Tr. 54. Plaintiff stated he takes insulin injections and pills. *Id.* When asked how the diabetic condition interfered with his ability to work, Plaintiff testified that it makes him nervous, nauseated, and weak, and his feet and legs swell. Tr. 54-55. Plaintiff also stated that he experiences a sensation of pins sticking in his feet daily. Tr. 55. Plaintiff testified that he was in a wreck two or three months prior and hurt his back. Tr. 55-56. He also testified that his left shoulder

"cramps up" but doctors have not yet determined the cause. Tr. 56. Plaintiff testified that doctors at the free clinic provided a cane for his use because of swelling in his legs. *Id.* These doctors also instructed him to elevate his feet. Tr. 57. Other than working for his father, Plaintiff also worked for a company owned by a family friend doing concrete finishing, and he worked for C&C Finishing, a company owned by his sister-in-law. Tr. 57-58. Plaintiff testified he was unable to work anywhere else because, due to his reading disability, he could not complete the applications and instructions. Tr. 58. Plaintiff stated that he stopped working before he became disabled because the company went out of business. Tr. 58-59. Plaintiff testified that he has recently "lost 25 pounds or better" and the following week was going to be tested because of blood found in his urine and bowel movement. Tr. 60-61. Plaintiff stated that on most days he "just sit[s] around the house." Tr. 61.  He stated that there was not much he could do because he could not stand for long, he was drowsy all the time, and his nerves "stay all upset" because he is unable to do things like he used to do. *Id.* Plaintiff testified that his medications keep him drowsy and dizzy. *Id.*

2. VE Testimony

The VE testified that Plaintiff's past work as a cement finisher was classified in the Dictionary of Occupational Titles ("DOT") as heavy, skilled, with an SVP of 7. Tr. 62-63. The ALJ asked the VE to identify jobs that could be performed by a hypothetical individual of the age, education, and experience as Plaintiff who could perform less than the full range of medium work; lifting 25 pounds frequently or occasionally; sit, stand, or walk up to six hours each in an eight-hour day; no concentrated exposure to extreme heat, respiratory irritants, dangerous machinery, or unprotected heights; no use of ladders; limited to jobs with no more than simple, repetitive tasks and instructions; occasional public contact; and lower

7

production pace. Tr. 63. The ALJ also noted that the individual would be functionally illiterate. Tr. 64. The VE stated that such an individual could perform medium, unskilled jobs and identified the following positions: inspector, DOT number 979.687-030, medium, SVP of 2, with 1,200 positions in South Carolina and 64,000 nationwide; and checker, DOT number 369.687-014, medium, SVP of 2, with 1,100 jobs in South Carolina and 57,000 nationwide.[5] Tr. 64. The VE confirmed that these positions would meet the restriction for light category work. Tr. 64-65. The ALJ asked if the identified jobs or any other jobs would be available if the individual could not sustain work on an eight-hour-per-day, five-day-per-week basis due to fatigue and occasional swelling of limbs. Tr. 65. The VE opined that it "would fall below what I consider to be competitive employment or full-time employment and certainly would eliminate these job examples I gave and really all full-time employment would be precluded." *Id.* The VE also found that if, as a result of mental limitations, the individual was unable to concentrate for two-hour blocks of time all jobs would be eliminated. *Id.*

Plaintiff's attorney asked the VE if the hypothetical individual could perform the identified occupations if the individual required one hour to elevate his feet to heart level, outside of normal lunches or scheduled work breaks. Tr. 66. The VE responded that accommodation would not be available in the job market. *Id.*

The VE identified the following light, unskilled, SVP:2 jobs that would also fit the ALJ's restrictions: packager, DOT number 920.687-166, 800 jobs in the state and 47,000 in the national economy; and inspector, DOT number 739.687-102, 700 in the state and 35, 000 nationwide. Tr. 66.

---

[5] The VE initially identified the job of metal products assembler, Tr. 63, but determined it should be excluded because of the lifting requirement, Tr. 64.

Plaintiff's attorney modified the ALJ's hypothetical for light occupations to add a new restriction based on processing speeds. Tr. 67. The attorney asked if the individual could perform the occupations of packager and inspector competitively if he carried out simple one and two-step instructions at two-thirds the speed of a normal worker. *Id.* The VE opined that "a third of the time off task or unproductive or not able to meet standards is not going to permit anyone to work." *Id.* The VE also opined, in response to a question from the attorney, that the issue of competitive employment for a person of Plaintiff's age who only worked in sheltered employment would need to be explored as to how well he would adjust and adapt, but the VE was unable to identify that limitation. Tr. 68.

II. Discussion

   A.  The ALJ's Findings

In her January 25, 2012 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2. The claimant has not engaged in substantial gainful activity since September 11, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: diabetes type II, hypertension, mild lumbar spondylosis, obesity, borderline intellectual functioning, and adjustment disorder with depressed mood (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work (lift/carry 10 pounds frequently and 20 pounds occasionally; sit, stand or walk up to 6 hours each in

9

      an 8 hour work day) as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant should never climb ladders; avoid concentrated exposure to dangerous machinery or unprotected heights; avoid concentrated exposure to extreme heat or respiratory irritants (fumes). He can perform simple repetitive tasks and instructions, in a low production pace job, with occasional public contact. The claimant is functionally illiterate.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 31, 1959 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 11, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 13-20.

    B. Legal Framework

        1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

    inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

>    to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings; (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with

evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id., Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the

entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C. Analysis

Plaintiff asserts that substantial evidence does not support the finding that Plaintiff did not meet Listing 12.05C for mild mental retardation. Pl.'s Br. 6, ECF No. 16. The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's impairments do not meet or medically equal Listing 12.05C. Def.'s Br. 11, ECF No. 21.

1. Listing 12.05C

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. §§ 404.1525(d), 416.925(d).

The introduction to Section 12.00 of the Listings clarifies how the structure for 12.05 differs from other mental disorder listings: "Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A). Listing 12.05 refers to intellectual disability[6] and states:

---

[6] Formerly defined as mental retardation.

13

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

In *Hancock v. Astrue*, the Fourth Circuit held that the first prong of Listing 12.05 analysis "requires a showing of 'deficits in adaptive functioning initially manifested during the developmental period.'" *Hancock*, 667 F.3d 470, 473 (4th Cir. 2012). The second prong "requires the satisfaction of one of four additional requirements." *Id.* The court held that "even if the ALJ's finding concerning Prong 2 of Listing 12.05C did not rest on substantial evidence, we would still be required to affirm the ALJ's decision if his finding with regard to Prong 1 was based on substantial evidence." *Id.* at 475.

Here, the ALJ found that Plaintiff did not meet the Paragraph C criteria of listing 12.05 because he "does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Tr. 15. The ALJ further noted that Plaintiff "has too much adaptive functioning to support a finding of mental retardation." *Id.*

### 2. Deficits in Adaptive Functioning

Citing to his school records, borderline IQ, functional illiteracy, marginal earnings, and inability to manage funds, Plaintiff asserts that the ALJ's analysis regarding his deficits in adaptive functioning does not "bear up" under examination. Pl.'s Br. 7-10. The

14

Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's impairments do not meet or equal listing 12.05C. Def.'s Br. 11.

The Fourth Circuit has provided instruction on the factors that determine deficits in adaptive functioning noting the deficits "can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)).

The ALJ noted that Plaintiff had "too much adaptive functioning" to meet the listing. Tr. 15. In making this finding the ALJ noted the evidence, including Plaintiff's regular activities, living and social situation, educational history, and medical information. At step three of her decision, the ALJ found that Plaintiff had moderate restriction in his ADLs and noted Plaintiff reported in his Function Report that "he is capable of taking care of his personal needs, cooks daily, goes to the grocery store, and watches television, but does not perform household chores because his girlfriend does the chores." Tr. 14 (citing to Ex. 14E (Tr. 168-75); Ex. 12F (Tr. 557-63)). The ALJ also found that Plaintiff had moderate difficulties in social functioning and indicated that he "spends time with others who visiting him. He talks to family and others on the telephone and attends church with his daughter occasionally. He has no problem getting along with family, friends, neighbors or others. He goes outside 3 to 4 times a week and goes to the grocery store with his daughter. He stated he obtained a driver's license, but has not driven since his last DUI." Tr. 14-15. The ALJ further found that Plaintiff had moderate difficulties regarding concentration, persistence, or pace. The ALJ noted that Plaintiff "was capable of answering all questions posed by Dr. Moody

and Dr. Salmon. Treatment records repeatedly report normal mood, affect, and behavior. He testified he did not need special reminders to take his medications." Tr. 15 (internal citations to record omitted).

In her analysis for Plaintiff's residual functional capacity, the ALJ noted Plaintiff's "ability to perform simple repetitive tasks, and follow simple instructions, in a low production pace job." Tr. 18. The ALJ also noted "factors such as taking care of personal needs without assistance, preparing simple meals for himself, shopping in stores for various household items, taking and passing oral test for driver's license, holding a steady job for 10 plus years" as evidence that despite Dr. Salmon's recent IQ score of 58, Plaintiff functioned at a higher level than listing 12.05C. *Id.*

Citing *Luckey v. United States Department of Health and Human Services*, 890 F.2d 666, 669 (4th Cir. 1989), Plaintiff argues that the ALJ applied an improper legal standard in considering his work history in determining Plaintiff does not have deficits in adaptive functioning. Pl.'s Br. 11-12. The Commissioner argues that the "ALJ may consider Plaintiff's prior work history when assessing whether Plaintiff has shown deficits in adaptive functioning." Def.'s Br. 12.  Work history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, *Luckey*, 890 F.2d at 669, can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *Hancock*, 667 F.3d at 475–76 (concluding that the ALJ's finding that the claimant did not manifest requisite deficits in adaptive functioning was supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); *Harts v. Astrue*, C/A No. 0:10–1893–CMC–PJG, 2012 WL 529982, at *6 n.3 (D.S.C. Jan. 30, 2012) (distinguishing *Luckey* because the ALJ used the claimant's work history as

only one factor to support his finding of no significant deficits in adaptive functioning) *adopted by* 2012 WL 529980 (D.S.C. Feb.17, 2012). The undersigned finds that the ALJ's rationale for finding Plaintiff does not meet the listing for intellectual disability based on lack of significant limitations in adaptive functioning is supported by substantial evidence.

### 3. Opinion of Dr. Salmon

Plaintiff asserts that the ALJ's decision applies an improper legal standard insofar as it discredits the psychological examination of Dr. Salmon for having been obtained by counsel. Pl.'s Br. 12. The Commissioner argues that the ALJ did not rest her determination on the single fact that the examination was made at the request of counsel, "but simply noted it, as one factor among many." Def.'s Br. 15.

In her decision, the ALJ gave little weight to the opinion of Dr. Salmon and noted the following:

> I find his opinion is based upon the claimant's statements and the claimant's subjective presentation at the examination. Additionally, Dr. Salmon's opinions were derived after a single-visit consultative examination of the claimant that was arranged and paid for by the claimant's representative. Dr. Salmon did not have a treatment relationship with the claimant or an opportunity for prolonged observation and examination. Moreover, as discussed above, treatment records repeatedly provide that the claimant exhibited normal mood and affect. I recognize that Dr. Moody's opinion, to which I have given greater weight than Dr. Salmon's opinion, also resulted from a one time evaluation. However, Dr. Moody's findings are more congruent with the other medical evidence in the file.

Tr. 18-19.

The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the

physician is a specialist." *Johnson v. Barnhart*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527). However, the weight to be accorded to a medical opinion is in the discretion of the ALJ, as long as his findings are supported by substantial evidence. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

The ALJ reviewed the record evidence and found the opinion of Dr. Salmon inconsistent with the record as a whole. The ALJ appropriately performed this review, considering Plaintiff's testimony and credibility, and also the report of another consulting examiner. The fact that the ALJ noted that Dr. Salmon's opinion was "arranged and paid for by the claimant's representative" is not in and of itself error.  "The court does not foreclose the possibility that whether a medical opinion is procured by attorney referral may sometimes be a factor in the weight given to that opinion; however, that fact alone is insufficient to establish substantial evidence for discounting the [ ] opinion . . . ." *Jordan v. Colvin*, No. 8:12-cv-01676-DCN,  2013 WL 5317334, at *7 (D.S.C. Sept. 20, 2013) (citing *Hinton v. Massanari*, 13 F. App'x 819, 824 (10th Cir. 2001) (holding that an ALJ may "question a doctor's credibility" when the opinion was solicited by counsel but "may not automatically reject the opinion for that reason alone")). Here, the ALJ specifically cited to other factors that caused her to give less weight to Dr. Salmon's conclusions and IQ scores, not simply because the opinion was solicited by Plaintiff's counsel. Tr. 18.  Moreover, "[t]his circuit permits an ALJ to weigh conflicting IQ test results . . . ." *Hancock v. Astrue*, 667 F.3d at 474.

As noted in *Hancock*, Plaintiff can prevail only if he can establish "that the ALJ erred in his analysis of Prong 1 and Prong 2." *Id.* at 475. Therefore, even if the ALJ had erred by giving less weight to the opinion of Dr. Salmon or in dismissing Plaintiff's IQ scores,

18

because the undersigned finds that the ALJ's finding regarding Plaintiff's adaptive deficits, Prong 1, was based on substantial evidence, her decision would have to be affirmed.

### III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of the whole record, including evidence regarding Plaintiff's conditions, and the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 205(g), sentence four, and Section 1631(c)(3) of the Act, 42 U.S.C. Sections 405(g) and 1383(c)(3), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

June 6, 2014                                                                      Kaymani D. West
Florence, South Carolina                                              United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**